## NATIONAL BANK OF NEWPORT, NEW YORK, v. NATIONAL HERKIMER COUNTY BANK OF LITTLE FALLS.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 172. Argued February 28, 29, 1912.—Decided May 27, 1912.

To constitute a preference under the Bankruptcy Act it is not necessary that the transfer be made directly to the creditor; it may be made to another for his benefit, and if preferential circuity of arrangement will not avail to save it.

Unless, however, the creditor takes by virtue of a disposition by the insolvent debtor of his property for the benefit of the creditor so that the estate is diminished the creditor cannot be charged with receiving a preference.

Where the endorser of the bankrupt's note, which is under discount at a bank and secured by the endorser's own collateral, pays the note, thereby recovering his collateral and charges the payment to the bankrupt to whom he is indebted in a larger sum on open account, there is no preferential payment to the bank which the trustee can recover from it as such, it not appearing that the bank was concerned with, or had any knowledge of, the relations between the endorser and the maker of the note.

172 Fed. Rep. 529, affirmed.

THE facts, which involve the question of whether a payment was an illegal preference under the Bankruptcy Act of 1898, are stated in the opinion.

*Mr. Henry J. Cookinham* for appellant:

Payment of the note was preferential.

The uncontradicted evidence shows that the debtor was insolvent at the time of the payment. There was a payment or transfer of property to defendant or for its benefit. The payment or transfer of property was a preference and the recipient received more, upon its debt, than the other creditors of the bankrupt. The creditor knew or had reasonable cause to believe, that a preference

was intended. The transfer was made within four months of filing the petition in bankruptcy.

The fact that the note was paid before due raises the presumption that the payment was preferential. No evidence was given to overcome the presumption.

Any payment, out of the ordinary course of business, is presumptive evidence of the intent of the insolvent to give a preference. *Graham* v. *Stork,* Fed. Cas. No. 5678; *Walbrun* v. *Babbitt,* 16 Wall. 577; *Hardy* v. *Gray,* 144 Fed. Rep. 922; *Dokkin* v. *Page,* 147 Fed. Rep. 438; *In re Gesas,* 146 Fed. Rep. 734.

The bank took what was virtually a general assignment from the Sheard Company.

The statute has reaffirmed the common law in regard to the knowledge of an agent being imputed to the principal.

It is not necessary that the transfer or payment should be direct to the defendant. If the effect of any transfer or payment is to prefer one creditor to his knowledge over the others, the transfer or payment will be set aside, for the benefit of the general creditors, no matter by what subterfuge it was effected. *In re Sanderson,* 149 Fed. Rep. 273; *In re Hockney* v. *Raymond,* 10 A. B. Rep. 213; *In re Beerman,* 112 Fed. Rep. 663; *Western Tie & Lumber Co.* v. *Brown,* 129 Fed. Rep. 728; *Benjamin* v. *Chandler,* 142 Fed. Rep. 217.

It is not necessary to show that a creditor has actual knowledge that the debtor is insolvent. The circumstances which would lead an ordinary prudent man to believe that a preference was intended is sufficient. *Sundheim* v. *Ridge Ave. Bank,* 138 Fed. Rep. 951; *In re Himes,* 144 Fed. Rep. 543; *In re Virginia Hard Wood Mfg. Co.,* 139 Fed. Rep. 209; *Parker* v. *Black,* 143 Fed. Rep. 560; *Webb* v. *Sachs,* Fed. Cas. No. 11,325; *Coder* v. *McPherson,* 152 Fed. Rep. 951.

The facts bring this case under the rule as to what will be considered knowledge or reasonable cause to believe

the debtor insolvent and that a preference is intended. *Thomas* v. *Adelman,* 136 Fed. Rep. 973; *West Philadelphia Bank* v. *Dixon,* 95 U. S. 180; *Merchants' National Bank* v. *Cook,* 95 U. S. 342; *Rogers* v. *Palmer,* 102 U. S. 263; *Sage* v. *Wynkoop,* 104 U. S. 319; *In re Eggert,* 102 Fed. Rep. 735.

The rule is that it is not necessary to show that a creditor has actual knowledge that the debtor is insolvent. The circumstances which would lead an ordinary prudent man to believe that a preference was intended is sufficient. In this case, however, the creditor had actual knowledge that the Newport Knitting Company was insolvent at the time of the payment. *Sundheim* v. *Ridge Ave. Bank,* 138 Fed. Rep. 951; *In re Himes,* 144 Fed. Rep. 543; *In re Virginia Hard Wood Mfg. Co.,* 139 Fed. Rep. 209; *Parker* v. *Black,* 143 Fed. Rep. 560; *Webb* v. *Sachs,* Fed. Cas. No. 11,325; *Coder* v. *McPherson,* 152 Fed. Rep. 951.

*Mr. Myron G. Bronner* for appellee.

MR. JUSTICE HUGHES delivered the opinion of the court.

This suit was brought in the District Court of the United States for the Northern District of New York by Charles B. Mason, as trustee in bankruptcy of the Newport Knitting Company, to recover the amount of an alleged preference. Decree for the complainant was reversed by the Circuit Court of Appeals, which remanded the cause with instructions to dismiss the bill. *Mason* v. *National Herkimer County Bank,* 172 Fed. Rep. 529. Subsequently, the trustee assigned the claim in suit to the National Bank of Newport, New York, which was substituted as complainant and brought this appeal.

The bankrupt, the Newport Knitting Company, was organized in 1900, by Titus Sheard and his associates, and was engaged in the manufacture of knit goods at Newport, New York. Proceedings for its voluntary dissolution were begun in October, 1903, and on December 30, 1903, a

petition in bankruptcy was filed against it. It was ad-judged a bankrupt on January 23, 1904.

Several of the officers and directors of this company were also officers and directors of a corporation known as the Titus Sheard Company, which manufactured knit goods at Little Falls. Titus Sheard was the leading spirit in both corporations; in each his son-in-law was the secre-tary and his nephew the general manager. The books of the Newport Knitting Company were kept at the office of the Titus Sheard Company. It does not appear that either company held stock in the other, nor is it shown to what extent the same persons had a stock interest in both. And upon the record the conclusion must be that, while the management of the two concerns was largely in the same hands, they were distinct organizations conducting separate businesses.

The Titus Sheard Company had a deposit account and discounted its paper with the defendant, the National Herkimer County Bank of Little Falls, of which Sheard was a director. The Newport Knitting Company was not a customer of the defendant bank, but kept its account with the National Bank of Newport.

The transaction which is alleged to constitute a pref-erence was as follows: On January 7, 1901, the Newport Knitting Company gave its note for $5,773.05, at four months, to the Titus Sheard Company to pay for machin-ery and supplies. The Titus Sheard Company endorsed the note and had it discounted by the defendant bank, receiving the avails for its own use. The note was re-duced by part payment to $5,000, and for this sum it was renewed every four months with like endorsement, the last renewal of this sort being on May 11, 1903.

In August, 1903, the defendant bank held a large amount of paper made or endorsed by the Titus Sheard Company and insisted upon security. Thereupon the Titus Sheard Company submitted to the bank a statement of its af-

fairs and on August 11, 1903, executed an instrument, also signed by Mr. Sheard and certain other officers individually, by which, after reciting the determination to liquidate its business, they purported to pledge its "mill property, all the machinery in the same, and the warehouse, together with all our assets of our Company, and also the individual properties, as per list hereto attached, to secure the National Herkimer County Bank for all notes of ours which they now hold, or may hereafter hold, and for all paper endorsed by us now held by the Bank, or that may be held by it in the future." This agreement evidently contemplated that the Titus Sheard Company should continue in possession of its property and should have charge of the winding up of its affairs on the understanding expressed, which was, in substance, that the property should be speedily converted into money, that bills payable held by creditors other than the bank should be renewed so far as possible, and that "all surplus moneys as fast as collected, not required to pay the outstanding notes held by other creditors," should be applied in payment of the indebtedness to the bank. It was declared to be the intention to dispose of the property so that all the indebtedness should be paid before January 1, 1904.

On August 22, 1903, there was substituted for the above-mentioned note of the Newport Knitting Company, endorsed by the Titus Sheard Company and held by the bank, a new three months' note of the Newport Knitting Company for the same amount, similarly endorsed; and the Titus Sheard Company secured this note by the delivery to the bank of specific assignments of its bills receivable, amounting to $6,300. On September 26, 1903, before maturity, the Titus Sheard Company paid to the bank the amount of this note, less accrued interest, $4,953.33, and took up the note and collateral. This payment was made by the Titus Sheard Company acting in its own behalf by a check drawn against the funds to

its credit in the bank. The amount so paid was then charged by that company to the Newport Knitting Company to which it was indebted on open account in a larger sum; and on the books of the Newport Knitting Company a corresponding credit was given to the Titus Sheard Company. So far as appears, this charge of the sum paid on the note against the amount owing to the Newport Knitting Company was not known to the bank.

It is insisted that this transaction amounted to a preference of the bank by the Newport Knitting Company. It is said that "the bankrupt parted with property to the amount of the note and the bank received it and was benefited to that amount," to the detriment of the other creditors of the Newport Knitting Company, then insolvent; or, as the District Court put it, that "a short cut was taken by common consent and the check was passed to the bank and the amount charged to the Knitting Company so that it in fact paid the note."

The pertinent provisions of the Bankruptcy Act as they stood at the time the transaction occurred, were as follows:

"Sec. 60. Preferred Creditors.—*a.* A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, or after the filing of the petition and before the adjudication, procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. . . .

"*b.* If a bankrupt shall have given a preference, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

To constitute a preference, it is not necessary that the transfer be made directly to the creditor. It may be made to another for his benefit. If the bankrupt has made a transfer of his property, the effect of which is to enable one of his creditors to obtain a greater percentage of his debt than another creditor of the same class, circuity of arrangement will not avail to save it. A "transfer" includes "the sale and every other and different mode of disposing of or parting with property, or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift, or security." Sec. 1 (25). It is not the mere form or method of the transaction that the act condemns, but the appropriation by the insolvent debtor of a portion of his property to the payment of a creditor's claim, so that thereby the estate is depleted and the creditor obtains an advantage over other creditors. The "accounts receivable" of the debtor, that is, the amounts owing to him on open account, are of course as susceptible of preferential disposition as other property; and if an insolvent debtor arranges to pay a favored creditor through the disposition of such an account, to the depletion of his estate, it must be regarded as equally a preference whether he procures the payment to be made on his behalf by the debtor in the account—the same to constitute a payment in whole or part of the latter's debt—or he collects the amount and pays it over to his creditor directly. This implies that, in the former case, the debtor in the account, for the purpose of the preferential payment, is acting as the representative of the insolvent and is simply complying with the directions of the latter in paying the money to his creditor.

But, unless the creditor takes by virtue of a disposition by the insolvent debtor of his property for the creditor's benefit, so that the estate of the debtor is thereby diminished, the creditor cannot be charged with receiving a preference by transfer. *Western Tie & Timber Company*

v. *Brown,* 196 U. S. 502, 509; *Rector* v. *City Deposit Bank,* 200 U. S. 405, 419. "These transfers of property, amounting to preferences, contemplate the parting with the bankrupt's property for the benefit of the creditor and the consequent diminution of the bankrupt's estate." *N. Y. County Bank* v. *Massey,* 192 U. S. 138, 147.

Here, the payment to the bank did not proceed from the bankrupt, the Newport Knitting Company. The Titus Sheard Company had a standing quite apart from its relation to the Newport Knitting Company as a debtor in the account. In the transaction with the bank, the Titus Sheard Company acted on its own behalf. As the holder of the original note, that company had endorsed it to the bank, taking for its own benefit the proceeds of the discount. Its obligation as endorser was continued by the renewals, and to secure the bank on the last renewal it had deposited its own collateral. It took up the note with its own funds and received back the security. Neither directly nor indirectly was this payment to the bank made by the Newport Knitting Company, and the property of that company was not thereby depleted.

The fact then is not, as it is contended, that "the bankrupt parted with property to the amount of the note and the bank received it," but rather that the bankrupt parted with nothing, and the bank received the money of the endorser and redelivered to the endorser the paper and collateral. When the Titus Sheard Company took up the note, it was credited with the amount of the payment in its account with the Newport Knitting Company. But the question, in the circumstances disclosed, of the right of the Titus Sheard Company to a set-off against its indebtedness on the account is distinct from the question whether the bank received a preference. *Western Tie & Timber Company* v. *Brown, supra.* It would be only by the allowance of such a set-off that the bankrupt estate would be diminished. And, as was said by the Circuit

Court of Appeals, "if the Sheard Company, knowing the Newport Company to be insolvent, acquired the note with a view to using it as a set-off or counterclaim against its debt, it could not legally do so (Bankruptcy Law, sec. 68*b*)." The amount of the indebtedness of the Titus Sheard Company could still be collected by the trustee.

It is urged that by virtue of the instrument already mentioned, which was executed by the Titus Sheard Company on August 11, 1903, all the assets of that company had been assigned to the bank, and hence that the security placed with the bank on the last renewal of the note was already held under this instrument and continued to be so held after the note was taken up, despite the surrender of the specific assignments. It is said further that as a result of the execution of this instrument, the bank "stepped into the place of the Sheard Company," and knew the condition of the account with the Newport Knitting Company and the charge that was made to it.

The argument attributes to the instrument undue importance and an effect which it did not accomplish. It was far from being an adequate legal security. Apparently, the Titus Sheard Company was left in the possession of the property, and its officers continued its management with freedom to sell, to collect accounts, to pay outstanding notes held by others than the bank (so far as they could not be renewed), and generally to liquidate the business in accordance with the expressed intention to convert the assets into money as speedily as possible and thus to meet all the obligations to the bank. To this end, the company and its officers were to "work faithfully" and the surplus moneys as fast as realized were to be devoted to the payment of the indebtedness. It was natural that the bank should require security for the note of a more definite and satisfactory character, that is, proper collateral. And when the bank received the specific collateral deposited by the Titus Sheard Company on the

·renewal, the bank obtained a control over it which other-wise it did, not possess, and this control it surrendered on the redelivery.  In view of the effort that was being made to reduce the obligations of the company held by the bank, it cannot be thought surprising .that the note with' the collateral was taken up before maturity.  It was not shown that the bank. had anything to do with the credit to the Titus Sheard Company in its account with the Newport Knitting Company.  Nor does it appear that the bank knew of the condition of this account or had ·any reason to· believe that it was proposed to set off the payment against an indebtedness to the bankrupt.

The bank dealt with the Titus Sheard Company as the endorser of the paper; and the trustee failed to establish any right to recover the moneys it received.  ·

*Decree affirmed.*