## OLMSTEAD v. MASSACHUSETTS TRUST CO.

(District Court, D. Massachusetts. February 24, 1926.)

No. 2145.

Bankruptcy ⟷167—Bank, receiving payment of insolvent partnership's note from partner indorser, who protected himself by taking firm's assets, held not to have received unlawful preference.

Where bank, holding notes of insolvent's partnership indorsed by partners, on learning of firm's condition, called on financially responsible partner for payment of notes soon maturing, and partner gave bank his personal note, to be paid in installments, and left proceeds thereof with bank's collection department to be applied on firm's notes, *held* no unlawful preference resulted, though bank may have known that such partner protected himself by taking assets of firm.

In Equity. Suit by James M. Olmstead, trustee in bankruptcy of the C. S. Stearns Shoe Company, against the Massachusetts Trust Company. Bill dismissed.

Clarence A. Barnes and White & Barnes, all of Boston, Mass., for plaintiff.

Harry H. Ham, Ralph H. Willard, and Ham, Willard & Taylor, all of Boston, Mass., for defendant.

MORTON, District Judge. This is a suit in equity by the trustee in bankruptcy of the C. S. Stearns Shoe Company to recover about $13,000, alleged to have been received by the defendant as a preference. It was heard in open court largely on oral testimony. There is but little controversy about the facts. The Stearns Shoe Company was organized in 1921, succeeding a partnership composed of Battey & Welch. It dealt in shoes at wholesale. Battey was a Hartford business man, who ran several retail shoe stores. Welch was a Boston lawyer, who attended to the active business of the company. In the early part of 1923 the Stearns Company made banking arrangements with the defend-

ant, under which a commercial credit of $15,000 was to be allowed, and this sum was immediately borrowed. In late March or early April a further loan of $5,000 was made in connection with certain manufacturing activities of the Stearns Company. About $11,000 of accounts receivable were assigned by the Stearns Company to the trust company as security for this and the other loans. All the notes were made by the Stearns Company and indorsed by Battey and by Welch.

About May 16th the trust company learned that sums collected by the Stearns Company on the assigned accounts had not been paid over to it. Welch was called to the trust company and had an interview with Mr. Whittaker, one of its vice presidents. I do not gather that there was any feeling on the part of the trust company that the managers of the Stearns Company had been dishonest in what had been done. There appears to have been some misunderstanding about the matter. The upshot of the interview was that the assignment of the accounts receivable of April 5th was discharged, and a new assignment, dated May 16th, of accounts receivable aggregating about $17,000 (including one of $11,000, due from Battey) was made as security for the trust company's loans to the Stearns Company.

Shortly afterward Battey called on Whittaker and said that the Stearns Company was liquidating its affairs, and that he wished Whittaker to get in touch with Welch, but without saying that Battey had suggested his doing so. Whittaker and Welch had an interview, at which Welch confirmed Battey's statements, and said that all the shoes owned by the Stearns Company had been shipped to Battey at Hartford, that it had no other property except its accounts receivable, which were of a face value of about $50,000, that its debts did not exceed about $35,000, and that it had an equity in the business of the difference. Whittaker expressed surprise that the concern which he had supposed was going ahead profitably and had good prospects should go into liquidation. He evidently felt that the trust company's position needed strengthening, and called in Battey for another interview, which took place on May 28th.

At that time Battey gave a demand note for $13,079 to the Trust Company, agreeing to pay it at the rate of $1,000 a week. The proceeds of this note Battey left with the trust company in its loan department, to be applied to the Stearns Company notes indorsed by him as they became due. There were at that time five such notes held by the

trust company, viz. two for $5,000 and three for $3,000, none of them as yet due. The trust company applied the proceeds of this note ($13,079) in payment of the above-mentioned notes as they fell due, and thereafter held those so paid for Battey as the indorser who had paid them. Certain amounts received from the assigned accounts were also applied on the notes, but these were relatively small, and do not enter into the present controversy.

Battey died in August, 1923, after making eight payments, of $1,000 each, on the $13,079, note. The trust company brought suit against his estate in Connecticut, and recovered practically the entire balance due to it; the case being settled by throwing off a few hundred dollars, which the trust company lost, and it also was out of pocket its legal fees. It received in all approximately $19,000. There was also litigation in Connecticut between the receiver of the Stearns Company and Battey's estate, the nature of which does not appear with clearness and certainty. On or about May 28th Battey appears to have been indebted to the Stearns Company for about $20,000 for the shoes which had been shipped to him. This fact was known to Mr. Whittaker.

The Stearns Company's debts were over $40,000. The book accounts realized only about $2,500, including sums collected both by the trust company and by the receiver and trustee. There is, I understand, no question but what, for several months preceding the filing of the bankruptcy petition on July 12, 1923, the Stearns Company had been insolvent in the bankruptcy sense. The insolvency appears, on the evidence before me, to have been due to the extraordinarily poor character of the book accounts. If those had been reasonably good, it would have had property enough to pay its debts.

The plaintiff contends that the payment of $13,079 to the trust company by Battey was in reality a preferential payment by the Stearns Company; that the purpose in shipping him the large amount of shoes just before liquidation was for him to realize on them and pay the proceeds to the trust company, and thus indirectly to effect a preference; and that this was known to the trust company. This view requires the rejection of Mr. Whittaker's testimony as intentionally false. While there is no doubt that the court will look behind the appearance of a transaction to its real character, it seems to me that the evidence fails to establish the plaintiff's contentions. I see no sufficient reason

to believe that the arrangement of May 28th had any ulterior purpose, or was in fact other than Mr. Whittaker describes it. All the notes of the Stearns Company which the trust company held were indorsed by Battey and Welch. The conduct of the parties indicates that Welch was not regarded as having any financial strength, but that Battey was and did. Mr. Whittaker testifies that the trust company did not know much about the business of the Stearns Company, but had confidence in the two men who were running it. When he learned, late in May, from Welch, just what the condition of affairs was, he called upon Battey as indorser to take care of the notes which would shortly become due, and made the arrangement above described. While he is, of course, an interested witness, he ought not to be discredited, and his testimony rejected on mere suspicion, without sufficient reason therefor. The notes were unquestionably good when made, and it seems to me to have been the not unusual case of an indorser on the notes of a liquidating concern being called upon to take up the notes as they fell due, and to have arranged to do so by leaving sufficient funds for that purpose in the hands of the bank. Battey may have protected himself by taking property of the insolvent maker, but that is not the present question. Even if the trust company knew that Battey had taken all the assets of the Stearns Company, except the accounts receivable, and that those were so uncollectible that the Stearns Company was insolvent, I still do not see why the Trust Company was prevented by such knowledge from taking payment from Battey on his obligations as indorser. The present case in its basic facts resembles Newport Bank v. Herkimer Bank, 32 S. Ct. 633, 225 U. S. 178, 56 L. Ed. 1042, rather than Dean v. Davis, 37 S. Ct. 130, 242 U. S. 438, 61 L. Ed. 419.

If Battey had been financially irresponsible, and the trust company had known that to be the fact, and that the payment was in reality being made by the Stearns Company through Battey as a screen, there might be grounds for supposing that the whole transaction was a cover for a preference. There is, however, no evidence, and no claim by the plaintiff, that Battey was irresponsible. On the contrary, the implications of the evidence are that he was a man of some property and of good standing in the business world, and in the plaintiff's brief it is said that his estate was solvent. Still less does it appear that the trust company knew or believed him to be insolvent, and was arrang-

ing with him on the basis of that knowledge to protect itself, or was colluding with him for his protection.

Bill dismissed, with costs.