THE FIRST NATIONAL BANK OF CUSH-
ING, a national banking association,
Plaintiff in Error,

v.

NATIONAL BANK OF TULSA, a national
banking association, Defend-
ant in Error.

No. 42981.

Supreme Court of Oklahoma.

Nov. 9, 1971.

Rehearing Denied Dec. 14, 1971.

James R. Ryan, Hess Crossland, of Conner, Winters, Randolph & Ballaine, Tulsa, for plaintiff in error.

Dean, Deas & Holland by John E. Deas, David P. Holland, Tulsa, for defendant in error.

DAVISON, Vice Chief Justice.

This appeal seeks reversal of a judgment rendered by the District Court of Payne County, Oklahoma, in favor of National Bank of Tulsa (NBT) and against First National Bank of Cushing (FNB) in the sum of $17,505.41 with interest at the rate of 6% per annum from April 2, 1964, to April 10, 1964, and from September 25, 1965, until paid. The judgment was based upon the findings (1) that on March 31, 1964, FNB converted to its own use $17,505.41 which funds were a portion of the total contract price payable to Reaves Drilling Company, Inc. (Reaves) by Livingston Oil Company (Livingston) for the drilling of a well, Gurney No. 1, located in Major County, Oklahoma, sometimes known as Unit 11–21–9 #2; (2) that the funds so converted were the property of NBT by virtue of a valid security interest perfected under procedure prescribed by the Uniform Commercial Code. The plaintiff in error, First National Bank of Cushing, the defendant in error, National Bank of Tulsa are referred to in the stipulation of facts and in the briefs by the symbols indicated above and will be so designated in this opinion.

Except for testimony of Mr. Earl Beard, Executive Vice President of NBT and Hazel Moffatt Terry, one time office secretary, bookkeeper and corporate secretary of Reaves, the facts are contained in a stipulation of the parties. Beard's testimony and Terry's testimony are entirely consistent with the fact stipulation of the parties.

The petition of NBT alleged the conversion of funds hereinabove described. The answer of FNB is a general denial.

The NBT's security interest in the funds alleged to have been converted by FNB came into being under the following circumstances, and by virtue of the following relationships. NBT was a correspondent of FNB. When Reaves, a customer of FNB, needed to borrow more funds than could be lawfully loaned to him by FNB, arrangements were made by FNB with NBT to lend Reaves the additional funds. In making such arrangements Beard acted for NBT and Levi Swingle, then President of FNB, acted for FNB and Reaves. Reaves was in need of more funds than FNB could lawfully supply him prior to Reaves' drilling of the Gurney No. 1 for Livingston. In negotiating a loan for

Reaves on this occasion, Swingle of FNB, followed a pattern of conduct with Beard of NBT that had been followed on prior similar occasions.

In contemplating a series of loans to Reaves, NBT, on January 4, 1963, properly filed a financing statement pursuant to the Uniform Commercial Code covering all of Reaves' present and future accounts receivable and the proceeds therefrom.

On December 2, 1963, Swingle of FNB forwarded to Beard of NBT a letter enclosing a properly executed collateral note dated December 3, 1963, executed by Reaves payable to the order of NBT in the principal sum of $30,000.00 secured by an assignment of invoice from Reaves to Livingston for the drilling of Livingston well, Gurney No. 1. The next day Beard of NBT notified Swingle of FNB that NBT agreed to carry the aforementioned loan and that the sum of $30,000.00, less discount, had been credited to the account of FNB for the use and credit of Reaves.

In antecedently conpleted loan transactions of a similar nature between the same parties, the collateral notes representing the loans would be paid by Reaves' delivery to NBT of Livingston's check payable to Reaves' order, properly endorsed, representing the proceeds of accounts receivable due Reaves for drilling Livingston wells. However, Swingle of FNB acted differently with particular reference to the $30,000.00 loan of December 3, 1963.

By letter dated December 31, 1963, Swingle, then President of FNB, advised Continental Emsco, a lien claimant against Livingston wells drilled prior to Gurney No. 1, that FNB was the assignee of certain Reaves' accounts receivable, including three accounts receivable from Livingston, and agreed to purchase the lien claims of Continental Emsco against the Livingston wells and other wells in accordance with the terms more particularly set forth in said letter.

On March 6, 1964, Livingston was notified by the attorney for FNB that he was serving notice of filing liens on certain wells. The amount of $17,505.41, as shown on the counterfoil of Livingston's later check to FNB, represented the payment for supplies furnished on the Livingston Fyffe Lease in the amount of $13,406.38 and the Livingston Butts Lease in the amount of $4,099.03.

By letter dated March 12, 1964, Oklahoma Natural Gas Company notified Livingston that Oklahoma Natural Gas Company had a lien claim in the amount of $1,581.24 on the Gurney Lease.

On March 30, 1964, Henry Martin of Livingston talked by telephone to Swingle of FNB about the liens on the Livingston wells, and Swingle advised Mr. Martin that he would have Reaves authorize Livingston to pay Oklahoma Natural Gas Company $1,581.24 and to pay FNB $17,505.41, and to pay the balance of $13,789.11 directly to Reaves as the remainder of the total account receivable of $32,875.16 then owed by Livingston to Reaves for the drilling of the Gurney No. 1.

NBT did not receive payment of Reaves' accounts receivable from Livingston in intended discharge of NBT's $30,000.00 loan to Reaves because FNB, with full knowledge of NBT's valid security interest, faithlessly importuned Livingston who had no knowledge of this interest, and at Reaves' invitation, to pay Oklahoma Natural $1581.24, FNB $17,505.41 and Reaves $13,789.11. These payments exhausted the accounts receivable in which NBT had a valid security interest and were made respectively by checks dated March 31, 1964; March 31, 1964, and April 7, 1964. When NBT was informed of these transactions by a telephone call to Livingston, Beard of NBT on April 7, 1964, then called Swingle, President of FNB, who said he would call Reaves and ascertain why NBT had not been paid. On April 8, 1964, NBT received Reaves' check dated April 7, 1964, for $30,040.00 drawn by Reaves on its account in FNB, apparently intended in payment of the $30,000.00 with interest. On

April 8, 1964, NBT charged the Reaves check against the FNB account at NBT. Reaves did not have sufficient funds in its account at FNB, from March 31, 1964, to May 7, 1964, to pay its check of April 7, 1964, to NBT. The Reaves check of April 7, 1964, was received by FNB on April 9, 1964. FNB not having returned the check by midnight on April 10, 1964, payment of the check occurred by operation of the Uniform Commercial Code, 12A O.S.1961, § 4–302 and § 4–104(1) (h). Reaves was adjudged a bankrupt on April 10, 1964, in involuntary proceedings. Later Reaves' Trustee in Bankruptcy made demand upon NBT for the return of the entire $30,400.00 represented by the Reaves' check payable to NBT dated April 7, 1964, asserting that the entire sum constituted a voidable preference under federal bankruptcy law. The Trustee urged that this payment was not traceable to the account receivable owed by Livingston to Reaves for drilling the Gurney No. 1 well. Under a letter agreement between the trustee and NBT, the trustee was paid $17,505.41 representing lien claims in the amounts of $13,406.38 and $4,099.03 on two antecedently drilled Livingston wells. This amount of $17,505.41 is the amount sued for in this action because it also represents the amount of the Livingston account receivable converted by FNB. FNB contends it was not consulted by NBT before NBT paid the trustee $17,505.41. As to this contention the record reveals nothing. On the basis of information received by Beard, executive vice president of NBT, Beard had reasonable cause to believe that Reaves was insolvent on or before April 7, 1964.

The decisive issue in this case, by virtue of the Reaves' Adjudication in Bankruptcy, is whether a voidable preference was effected under Section 60 of the Bankruptcy Act (11 U.S.C.A. § 96) by virtue of certain facts hereinafter stated. If a voidable preference was not effected, NBT unnecessarily relinquished $17,505.41 to the Trustee of the Reaves' bankrupt estate. Had NBT not been required legally to do so, NBT would have remained whole and remained compensated for the damage it suffered by reason of FNB's conversion of NBT's valid security interest in Reaves' accounts receivable from Livingston for drilling the Gurney No. 1.

Section 60 of the Bankruptcy Act, in part, provides:

"(a) (1) A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

"(2) For the purposes of subdivisions (a) and (b) of this section, a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee."

The first sentence of Section (b) of the Bankruptcy Act provides:

"(b) Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent."

FNB contends that the payment by FNB of the Reaves check of April 7, 1964, for $30,040.00 to NBT was not a voidable preference under the Bankruptcy Act because such payment did not constitute a transfer of the debtor's property by the debtor so as to diminish his estate. NBT contends that the payment of the Reaves

check did constitute a voidable preference because the payment of the check by FNB was in fact a transfer of the debtor's property by the debtor so that NBT received a preference over other creditors of the same class.

We have concluded that by virtue of the issuance, delivery, acceptance and payment by operation of law, of the Reaves check of April 7, 1964, payable to the NBT in the sum of $30,040.00, a voidable preference was effected for the following reasons:

(1) There was a transfer by the debtor of the debtor's property consisting of a loan by FNB to its depositor Reaves as a result of the overdraft. Both FNB and NBT agree that by virtue of the above transaction an overdraft occurred and that an overdraft is in legal effect an unsecured loan the bank has made to its depositor. FNB cites "the classic ruling" in Becker v. Fuller, 99 Misc. 672, 164 N.Y.S. 495 (1917) that "an 'overdraft' by a depositor of a bank is in the nature of a loan made at the request of the depositor, and implies a promise to pay." NBT cites Torrance National Bank v. Enesco Federal Credit Union, 134 Cal.App.2d 316, 285 P.2d 737 (1955) which says (dictum): "An overdraft is in legal effect a loan by a bank to its depositor."

The payment to NBT of the $30,000.00 note with interest occurred on April 8, 1964, the day NBT accepted the Reaves check in payment of the note. That NBT accepted the Reaves check in payment of the note is certain because NBT on April 8, 1964, by letter to Reaves, acknowledged receipt of the check in payment of the $30,000.00 note from Reaves to NBT dated December 3, 1963, and returned to Reaves the paid note, the security agreement and the invoice. The last sentence of this letter is: "We are enclosing the note marked 'Paid' together with the Security Agreement and invoice for your file."

There is no doubt that NBT did, by this conduct, agree to and did in fact accept the Reaves check of April 7, 1964, in absolute payment of the $30,000.00 note. We have held in a number of cases that: "A check, without regard to whether that of the debtor or of a third person, does not constitute payment, unless it is agreed that it shall be taken as an absolute payment." Wheeler & Motter Merc. Co. v. Kitchen, 67 Okl. 131, 169 P. 877 (1917); Dungan v. Jesko, 118 Okl. 217, 346 P. 1094 (1926); Liberty Nat. Bank of Weatherford v. Simpson, 187 Okl. 274, 102 P.2d 844 (1940). According to § 3 of an annotation appearing at 7 A. L.R. 1015, this same rule applies under federal decisions dealing with a voidable preference in the Bankruptcy Act. With a host of supporting cases it was there said: "Where the alleged preferential payment results from the payment of a note or check, it is generally held, *in the absence of evidence that the instrument was accepted as payment,* that the effective date of the transfer is when the check or note is paid and not when it is delivered." (Emphasis supplied)

NBT and FNB have stipulated that the payment of the Reaves' check of April 7, 1964 "was made final at midnight on April 10, 1964, by operation of the Uniform Commercial Code." Had the Reaves check of April 7, 1964, not been finally paid, NBT would have been relegated to the position of pressing its claim against Reaves or against his bankrupt estate based upon the Reaves check of April 7, 1964. "Where a creditor agrees or consents to receive a check of his debtor as payment, the original indebtedness is thereby extinguished pro tanto, whether or not the check is actually paid by the drawee upon presentment and even though payment thereof is stopped by the maker." Odou & Arnold v. Benson, 59 N.D. 101, 228 N. W. 812 (1930). The act of the FNB on May 8, 1964, in charging the Reaves' check to the Reaves' account was utterly meaningless and without relevance.

(2) The transfer of the debtor's property was for the benefit of a creditor, NBT.

(3) The debt of Reaves, occurring as it did upon the execution December 3, 1963, of the $30,000.00 note to NBT, was an antecedent debt or the Reaves check of April 7, 1964, to NBT in payment of the $30,000.00 note, created an antecedent debt.

(4) The transfer occurred as a result of the events delineated under (1) above within four months of the filing of the involuntary petition in bankruptcy on April 10, 1964.

(5) The transfer was made at a time the debtor was insolvent.

(6) The transfer occurred as a result of the events delineated in (1) above so that NBT received payment in full of Reaves' $30,000.00 indebtedness to NBT and not a lesser percentage that other creditors of the same class will be required to take.

(7) In light of the testimony of Beard, executive vice president of NBT, the NBT had reasonable cause to believe that Reaves was insolvent at the time of the transfer.

■ That the seven items hereinabove set forth constitute the seven elements which make up a voidable preference was held in Kenneally v. First National Bank of Anoka, C.A.8th, 400 F.2d 838, 844, n.7 (1969) cert. denied 1969, 393 U.S. 1063, 89 S.Ct. 716, 21 L.Ed.2d 706. This decision merely sets forth the elements that are clearly articulated in the provisions of Section 60 of the Bankruptcy Act (11 U.S.C. A. § 96) hereinabove set forth. The absence of any one of the elements negates a voidable preference. Moran Bros., Inc. v. Yinger, C.A.10th, 323 F.2d 699 (1963).

■ But FNB says the payment of Reaves' indebtedness to NBT was not paid by Reaves but by the FNB and did not diminish the bankrupt estate and that for this reason the transactions involved here are amenable to the rule that "A transfer of money or property by a third person to a creditor of a bankrupt, which does not issue from the assets of the bankrupt and does not diminish the bankrupt's estate is therefore not a preference." 3 Collier on Bankruptcy 14th ed. p. 880. This rule is supported by the following cases: National Bank of Newport v. National Herkimer County Bank of Little Falls, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912); Continental & C. T. & S. Bank v. Chicago Title & Trust Company, 229 U.S. 435, 33 S.Ct. 829, 57 L.Ed. 1268 (1913). These cases deal with voluntary acts of rational persons, not legal effects that occur by operation of law. As emphasized in Smyth v. Kaufman, 114 F.2d 40, 130 A.L.R. 951 (1940) it is the conscious control by a third person of the transfer of his money or property to a creditor, that avoids a voidable preference. The control of this transaction emanated from Reaves alone when Reaves issued a check payable to the order of NBT which check was accepted by NBT in payment of the $30,000.00 note. The Reaves check was paid, as stipulated, by operation of law resulting in a loan from the FNB to Reaves for that purpose. The payment was not the result of the conscious direction and control of FNB.

■■ Accordingly we hold that a voidable preference under Section 60 of the Bankruptcy Act was effected; that NBT had legal justification for paying $17,505.-41 to the Trustee of the Reaves' bankrupt estate and for that reason NBT had never been compensated for the damage resulting from the appropriation of FNB to its own use that amount of NBT's accounts receivable. Accordingly the judgment of the trial court is affirmed.

WILLIAMS, BLACKBIRD, JACKSON, IRWIN, HODGES, LAVENDER and McINERNEY, JJ., concur.