715 F.2d 934
 Bankr. L. Rep. P 69,401
In the Matter of Harold C. ABRAMSON, Trustee.
Harold C. ABRAMSON, Trustee in Bankruptcy of Galaxy
Industries, Inc., Plaintiff-Appellee,
v.
ST. REGIS PAPER COMPANY, Defendant-Appellant.
 No. 81-1570.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 26, 1983.
 
 Passman, Jones, Andrews, Holley & Co., Mark R. Saiter, Jerry C. Alexander, Dallas, Tex., for defendant-appellant.
 Taylor & Mizell, Bradford D. Corrigan, Jr., Dallas, Tex., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Texas.
 Before BROWN, GEE and JOLLY, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 Harold C. Abramson, trustee in bankruptcy for Galaxy Industries, filed this action under § 60b of the Bankruptcy Act of 1898 (former 11 U.S.C. § 96) to recover the value of a preference allegedly given to Southland Paper Mills, Inc.* The district court found that an avoidable preference had been given and ordered Southland to pay Galaxy $119,500--the difference between the value of the transferred property and the amount which Southland paid to Galaxy. Southland appeals. Finding no error, we affirm.
 
 
 2
 Galaxy Industries, also known as Galaxy Press (Galaxy) was engaged in the printing and publishing business in Dallas, Texas. Never profitable, it was adjudged a bankrupt pursuant to a petition filed on February 11, 1976, in the United States District Court for the Northern District of Texas.
 
 
 3
 Galaxy leased the major portion of its equipment--a web offset press and accessories--from Perkins-Goodwin Co., Inc., doing business as P-G and TIC Leasing Co. (P-G). Under an option agreement between P-G and Clarence Stark, Galaxy's president, Stark had the right to purchase the option equipment for $50,000 on or before December 15, 1975.[1] Galaxy itself owned some additional equipment (the "support equipment").
 
 
 4
 Galaxy's major customer was an organization known as "Texas Methodist/United Methodist Reporter," (Texas Methodist), for which Galaxy published a church-related newspaper. Galaxy leased office space from Texas Methodist in the building where Texas Methodist was located.
 
 
 5
 Southland Paper Mills, the defendant and appellant in this case, was a supplier of newsprint to Galaxy. On October 20, 1975, the date on which the preferential transfer took place, Galaxy was in debt to Southland to the tune of $105,540. The record shows, through the deposition testimony of Southland's Vice-President of Finance, that by that time Southland "had become quite concerned" about Galaxy's account and had informed Galaxy that it would have no choice but to stop selling newsprint to Galaxy if Galaxy's outstanding debt could not somehow be reduced.
 
 
 6
 The preferential transaction in fact consisted of several interdependent and virtually simultaneous transactions. Galaxy, through Clarence Stark, released the option to purchase in favor of Southland. Southland purchased the option equipment from P-G for the option price of $50,000 cash. Southland also purchased the support equipment from Galaxy for $16,500. Southland then sold the option and support equipment to Texas Methodist for $186,000, to be paid in installments of $3,100 per month. Texas Methodist allowed Galaxy to continue to use the printing equipment. Apparently in hopes of keeping Galaxy afloat, Texas Methodist also gave Galaxy free rent and utilities and took over much of Galaxy's payroll.
 
 
 7
 In return for Galaxy's release of the purchase option, Southland cancelled Galaxy's $105,540 debt.[2] The entire multi-faceted transaction took place on October 20, 1975.[3]
 
 
 8
 The transaction benefited all parties. Galaxy had been relieved of $105,540 in outstanding debts and of the prospect of the loss of its newsprint supply. Southland received $186,000 in return for a total expenditure of $66,500 and the cancellation of Galaxy's debt, repayment of which was very uncertain. P-G had received the requested option price of $50,000 in cash. Texas Methodist now owned the printing equipment and had assured itself of the continued availability of printing equipment and, temporarily, a printer for its newspaper.
 
 
 9
 Bankruptcy proceedings were filed against Galaxy on February 11, 1976, less than four months after the transaction took place.
 
 
 10
 Abramson, Galaxy's trustee in bankruptcy, filed this action in July of 1976, seeking to avoid the October 20 sale of the option to Southland as a preferential transfer under § 60 of the Bankruptcy Act.[4]
 
 
 11
 After hearing, the district court concluded that "[t]he transfer of the support equipment and the option from Galaxy to the Defendant constituted a preference within the meaning of Section 60a of the Bankruptcy Act." It also ruled that the subsequent transfer of the option equipment and support equipment constituted an act of conversion within the meaning of Section 60b of the Act. The court rendered judgment for the trustee against Southland for $119,500, the difference between the amount paid to Galaxy by Southland and the value it received.
 
 
 12
 On appeal, Southland claims that the trial court erred as a matter of law by finding a preference without determining whether a diminution of the bankrupt's estate took place. Such a determination is essential, says Southland, to any holding that a transfer is an avoidable preference.
 
 
 13
 Southland argues, moreover, that the court was clearly erroneous in determining the value of the option. Southland contends that the option had no value to Galaxy because Galaxy did not have and could in no way obtain the financial wherewithal to exercise it. By its terms, the option would have expired on December 15, 1975, unexercised, and the equipment would have returned to P-G. Because the option had no value, moreover, any implicit finding that the estate was diminished is also necessarily clearly erroneous.
 
 
 14
 Finally, Southland contends that the court was clearly erroneous in determining that no new value was given for the option. Southland points to the various considerations, such as free rent and utilities, which Galaxy received from Texas Methodist in connection with the October 20 transaction.
 
 
 15
 For the reasons set forth below, we reject Southland's arguments and affirm the judgment below.
 
 
 16
 In Palmer v. Radio Corporation of America, 453 F.2d 1133, 1135 (5th Cir.1971), this Court articulated the elements which must be present before a transfer may be held to be preferential under § 60 of the old Bankruptcy Act.
 
 
 17
 Before a transfer may be deemed preferential under § 60(a) six statutory elements must be present: (1) there must be a transfer of the debtor's property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt; (4) the transfer must be made or suffered while the debtor is insolvent, (5) within four months of bankruptcy; and (6) the effect of the transfer must be to allow the creditor to obtain a greater percentage of his debt than some other creditor of the same class. Section 60(b) adds the additional requirement that the transferee must have had reasonable cause to believe the debtor was insolvent at the time the transfer was made. Even though not expressly provided by the statute, it is implicit from the language used that the transfer must result in a diminution of the bankrupt estate.
 
 
 18
 Explaining the diminution requirement, the Court continued,
 
 
 19
 There is no statutory requirement that there be a diminution of the bankrupt estate. However, such a requirement is implicit in the language of the statute: a transfer "for or on account of an antecedent debt", shall not permit one creditor "to obtain a greater percentage of his debt than some other creditor of the same class."
 
 
 20
 453 F.2d at 1135, n. 3 [Citations omitted] See also National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912); Walker v. Wilkinson, 296 F. 850 (5th Cir.1924), cert. denied, 265 U.S. 596, 44 S.Ct. 639, 68 L.Ed. 1198 (1924), 3 Collier on Bankruptcy pp 60.02, 60.20 (14th ed. 1977).
 
 
 21
 Thus Southland is correct in its claim that diminution of the estate is essential to a finding that a preferential transfer has taken place. As Palmer illustrates, however, diminution is not an explicit statutory requirement, but is considered to be implicit in the statutory language. For that reason, we conclude that a finding of diminution is implicit in the district court's findings that the statutory requirements were satisfied. The record plainly shows that the question of diminution of the estate was before the court. The court did not err in failing to explicitly state its conclusion that diminution of the estate had occurred.
 
 
 22
 The standard of appellate review for factual findings in bankruptcy cases was set forth in Matter of Multiponics, Inc., 622 F.2d 709 (5th Cir.1980). "A Court's conclusions of law are freely reviewable on appeal. [Citations omitted] As to all findings of fact, however, a reviewing court of a bankruptcy decision must accept the findings as found, unless they are clearly erroneous." 622 F.2d at 713.
 
 
 23
 The burden is squarely on the appellant to show an appellate court that a finding is clearly erroneous, Griffin v. Missouri Pac. Ry. Co., 413 F.2d 9 (5th Cir.1969), and reversal of a finding is proper only when "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." (Citations omitted).
 
 
 24
 622 F.2d at 723.
 
 
 25
 Southland disputes three of the court's factual findings, claiming that they are indeed clearly erroneous. The first is the implicit finding that Galaxy's estate was diminished by the transfer. Second, and closely if not inextricably related, is the trial court's finding that the value of the option combined with the support equipment was $136,000.[5] Finally, Southland claims that the court erred in holding that the option was released to Southland purely in exchange for cancellation of the antecedent debt of $105,540.
 
 
 26
 As we have stated, the issues of the value of the option and depletion of the estate are intertwined. The crux of Southland's argument is that because the option to purchase had no value to Galaxy, due to its grave financial condition, the transfer of the option could not possibly have depleted Galaxy's assets. In support of that argument, Southland points to various attempts, testified to by Stark, indicating that strenuous efforts were made to raise the $50,000 necessary to exercise the option.[6] All of these efforts were in vain. Because of Galaxy's inability to raise the $50,000, says Southland, the option would have expired on December 15, 1975,[7] and would have been unavailable to be distributed as an asset of the estate to Galaxy's creditors after Galaxy was adjudged bankrupt.
 
 
 27
 Despite these efforts and despite Southland's arguments, we are not left with "the definite and firm conviction that a mistake has been committed" by the district court. We agree with Southland that the trustee has the burden of proving each and every element of a preference, including the value of the transaction and the fact that the estate has been diminished. 3 Collier on Bankruptcy, p 60.20 (14th ed. 1977). The trustee has met that burden.
 
 
 28
 The value of the option equipment and support equipment was clearly shown by the $186,000 which Texas Methodist was willing to pay to acquire them as of October 20. The cost of exercising the option was $50,000. Thus, the court was justified in concluding that the value of the option itself plus the support equipment equaled $136,000.[8] When the $16,500 purchase price for the support equipment is subtracted from that figure, $119,500 remains--the value of the preference to Southland. By virtue of the transaction, Southland received enough money to pay off the antecedent debt of $105,400 and to make a small profit besides. We cannot say that the court erred in determining the value of the option in support equipment.[9]
 
 
 29
 Nor can we say that the court erred in concluding that the transaction depleted the bankrupt's estate.
 
 
 30
 We have been unable to find any case concerning this precise problem, in which the transfer of property having acknowledged value is claimed not to have depleted the bankrupt's estate because the bankrupt's financial circumstances rendered that property peculiarly valueless to it. In our opinion, however, by proving the seven statutory elements of § 60 and by proving in addition that the property transferred belonged to Galaxy and had value at the time of transfer, the trustee has fulfilled his burden of establishing that a diminution of the estate occurred. From the transfer of valuable property out of the bankrupt's hands, diminution of the estate can be inferred.
 
 
 31
 Southland was free to present evidence, as it undertook to do, to show that because of circumstances peculiar to the bankrupt no depletion of the assets of the estate took place. Contrary to Southland's arguments, however, the mere presentation of such evidence is not conclusive--the finder of fact is free to give it such credence as he or she will and to determine the value of the transferred property according to the record as a whole. In this case, Southland showed several ways in which Galaxy attempted to raise the $50,000 which would have enabled it to exercise the option and gain title to the option equipment. These methods failed. That failure does not conclusively show, however, that the option was of no value to Galaxy. It is conceivable that other methods or approaches might have been tried, such as direct purchase by Texas Methodist or some third party other than those actually approached by Stark. The trial court in a circumstance such as this was entitled to consider that possibility. Certainly the trustee's burden of proof does not require the trustee to construct a hypothetical alternative transaction and to prove that such a transaction would have been agreed to and approved by all parties concerned. Moreover, the trial court was entitled, indeed obligated to consider the fact that the transaction took its complex form, among these parties, for specific reasons. The transaction was designed to benefit Southland, Galaxy's creditor, as well as to benefit Texas Methodist, P-G, and Galaxy itself. The debtor, the creditor and the other interested parties structured the deal so as to be mutually most beneficial to all--to all, that is, but other creditors, who might have received a share of the value of the property had the transaction taken different form. Stark's testimony that he attempted to raise the $50,000 and was unsuccessful did not obligate the trial court to conclude that the option had no value to Galaxy or that its sale did not deplete Galaxy's estate. The fact that Stark's earlier efforts were fruitless is not conclusive proof that the property was worthless to Galaxy outside the context of this particular transaction. Certainly we cannot say that the trial court's finding was clearly erroneous. The preferential transfer of the option and support equipment to Southland resulted in a depletion of the assets of the bankrupt estate.
 
 
 32
 Finally, Southland contends that the transfer was not made in exchange for forgiveness of an antecedent debt because new value was given in the form of free rent and utilities, the payment of Galaxy's employees, and favorable printing conditions. As the trustee correctly points out, these favors were rendered by Texas Methodist, not by Southland. They were not made part of consideration for the transfer of the option and support equipment, nor are they mentioned anywhere in the extensive documents by which the transaction was accomplished. Nothing in the record indicates that these privileges were enforceable or that they were essential to the transaction. In fact, the evidence is to the contrary. We find no error in this finding of the court.
 
 
 33
 The trial court's findings were not clearly erroneous. The court properly could render judgment for the trustee for $119,500.
 
 
 34
 AFFIRMED.
 
 
 
 *
 During the course of this litigation, Southland Paper Mills, Inc. was merged into St. Regis Paper Company. For the sake of consistency, we will continue to refer to the defendant as Southland Paper Mills, Inc
 
 
 [1]
 Stark entered into the agreement as agent and nominee for Galaxy. He testified, and it is undisputed, that the option was simply held in his name for Galaxy and that he was acting on Galaxy's behalf
 Originally the option was due to expire on December 17, 1974. It was extended for one year by agreement of the parties.
 
 
 [2]
 The "Cancellation of Debt and Release" executed by Southland states, in part,
 Whereas, Galaxy Industries, Inc., a Nevada corporation, is currently indebted to Southland Paper Mills, Inc., a Texas corporation, under open account or otherwise of the sum of approximately $105,540.00 as of the date hereof incurred in the purchase of newsprint and/or freight and/or otherwise.
 Now, therefore, for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, and other good and valuable considerations, among them being the release in favor of Southland Paper Mills, Inc., by Clarence D. Stark, President of Galaxy Industries, Inc., of the Option to Purchase that one certain web offset printing press from Perkins-Goodwin Company, Inc., currently in the possession of Galaxy Industries, Inc., the receipt and sufficiency of all said considerations being hereby acknowledged, Southland Paper Mills, Inc., does hereby cancel said indebtedness of Galaxy Industries, Inc., to Southland Paper Mills, Inc., of the sum of approximately $105,540.00 in its entirety.
 
 
 [3]
 On March 31, 1976, Texas Methodist purchased new printing equipment from Harris Corporation, receiving $130,000 in trade-in value for the equipment purchased on October 20
 
 
 [4]
 § 60. Preferred Creditors. a. (1) A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class
 b. Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. Where the preference is voidable, the trustee may recover the property or, if it has been converted, its value from any person who has received or converted such property, except a bona-fide purchaser from or lienor of the debtor's transferee for a present fair equivalent value: Provided, however, That where such purchaser or lienor has given less than such value, he shall nevertheless have a lien upon such property, but only to the extent of the consideration actually given by him. Where a preference by way of lien or security title is voidable, the court may on due notice order such lien or title to be preserved for the benefit of the estate, in which event such lien or title shall pass to the trustee. For the purpose of any recovery or avoidance under this section, where plenary proceedings are necessary, any State court which would have had jurisdiction if bankruptcy had not intervened and any court of bankruptcy shall have concurrent jurisdiction.
 
 
 [5]
 The trial court found:
 On the transaction date, the support equipment and the option equipment together had an aggregate value of $136,000.
 The court also concluded:
 Plaintiff is entitled to recover of Defendant Southland Paper Mills, Inc., the value of the support equipment and the option at the time such assets were transferred by Galaxy to Defendant less the cash consideration paid by Defendant to Galaxy in such transaction.
 It is clear from these findings and conclusions and the remainder of the record that the court considered the value of the support equipment and the option itself to have been $136,000--$186,000 (the price paid by Texas Methodist for all the equipment) minus $50,000 (the cost of exercising the option). The $136,000 figure minus the $16,500 cash consideration paid to Galaxy equals $119,500, the amount awarded Galaxy by the court.
 
 
 [6]
 Stark testified that he attempted to borrow $50,000 from at least three different sources and was turned down. During at least one of these attempts a third party, another paper supplier, was prepared to act as guarantor. Stark also attempted to sell the press outright to at least one buyer and to use $50,000 of the purchase price to pay off the option
 
 
 [7]
 The testimony at the hearing was to the effect that the option would not have been extended again
 
 
 [8]
 See note 5, infra
 
 
 [9]
 Southland urges that Palmer Clay Products v. Brown, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936) requires that we consider the value of the option at the time of bankruptcy rather than at the time the transfer was made. According to Southland, the value at bankruptcy would be nothing, because the option would have expired in December, before bankruptcy was declared
 This argument is ill-founded. In Palmer Clay Products, the Supreme Court simply considered, and rejected, the argument
 that a creditor who receives a part payment of his claim does not receive a preference, although he has reason to believe that the debtor is insolvent, provided the debtor's assets at the time of payment would, if then liquidated and distributed, be sufficient to pay all the creditors of the same class an equal proportion of their claims.
 Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.
 297 U.S. at 229, 56 S.Ct. at 450, 451, 80 L.Ed. at 657.
 Palmer Clay Products holds that the preferential effect of a payment to a creditor is to be determined from the perspective of the date of the filing of bankruptcy. The value of the asset transferred, such as the option here, is its value at the time of transfer. See 3 Collier on Bankruptcy p 60.19, n. 9, p 60.36 (14th ed. 1977).