In re STOP–N–GO OF ELMIRA, INC., Debtor.

John B. LAWLESS, as. Trustee of Stop-N-Go of Elmira, Inc., Plaintiff,

v.

EASTERN MILK PRODUCERS COOPERATIVE ASSOCIATION, INC., Thomas Butler, William Woodhull and Lawrence Creighton, Defendants.

Bankruptcy Nos. 79–237, 80–120.

United States Bankruptcy Court, W.D. New York.

June 15, 1983.

Peter T. Rodgers, David MacKnight, Rochester, N.Y., for plaintiff.

Peter N. Wells, Barbara Walzer, Syracuse, N.Y., for Eastern Milk Producers Coop. Ass'n, Inc.

James L. Burke, Elmira, N.Y., for Thomas Butler, William Woodhull and Lawrence Creighton.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

This is an action under §§ 60, 67 and 70 of the Bankruptcy Act to recover a preference and or fraudulent transfer from Stop-N-Go of Elmira, Inc., hereinafter referred to as Stop-N-Go, to Eastern Milk Producers Cooperative Association, Inc., hereinafter referred to as Eastern. The individual defendants, Thomas Butler, William Woodhull and Lawrence Creighton, were officers of Stop-N-Go. There has been extensive pretrial hearings, depositions and motions in regard to this case. But the case has been tried, briefs have been submitted and it is now ready for decision.

It appears that Thomas Butler, William Woodhull and Lawrence Creighton were officers and the sole owners of a corporation known as Maple Farms, Inc., hereinafter referred to as Maple. They operated this corporation for some 25 years prior to December of 1978. Some nine years before December of 1978, Butler, Woodhull and Creighton formed a new corporation known as Stop-N-Go of Elmira. This corporation was owned by the three principals and Maple.

Maple was a dairy. It processed milk and sold milk to various retail outlets. Stop-N-Go in the year 1978 had some 26 convenient stores located across the Southern Tier of the State of New York. Maple purchased milk from defendant, Eastern, beginning in 1976. In the Fall of 1977, Maple was delinquent some $300,000 in their payments to Eastern. In February of 1978, they gave a note to Eastern in the amount of $300,000 as evidence of the debt which they owed Eastern. Eastern throughout 1978 continued to supply Maple with milk at the rate of about $100,000 worth of milk per month.

One payment of $50,000 plus some interest was made upon the $300,000 note. However, by September 30, 1978, Eastern was owed by Maple $549,648.26 on their current account and they owed $254,650.20 on the note.

Mr. Dorn, who was the financial manager of Eastern, became concerned in late 1977 and early 1978 over Maple's delinquency to Eastern. He was instrumental in securing the note from Maple and its president, Mr. Butler, in February of 1978. He was the only unsecured creditor of Maple who received notice of the negotiations which Mr. Butler began with the franchisor of Stop-N-Go to sell the 26 outlets which Stop-N-Go had to the franchisor, Sun Oil Company. Subsequently, in about August of 1978, the negotiations between Maple and the Sun Oil Company for the purchase of the corporations known as Stop-N-Go and Maple by Sun Oil Company failed. Mr. Dorn was apprised of the failure of these negotiations but he was also apprised of the fact that Stop-N-Go was negotiating with another franchisor, Southland Company, which operated the Seven-Eleven Stores.

During Butler's and Dorn's discussions in August of 1978, Dorn suggested to Butler that Stop-N-Go secure the debt of Maple to Eastern. He did this after he reviewed the June 30, 1978 statements of both Maple and Stop-N-Go. Dorn, who was a CPA, and had spent some time with a national firm acting as an account executive and CPA, had looked over the financial statements of both Maple and Stop-N-Go. The statements provided by Stop-N-Go and Maple were unaudited ones. They did disclose that on June 30, 1978, Stop-N-Go had approximately $34,000 in net worth. Subsequently, it was discovered that in fact this net worth was over stated.

On September 29, 1978, Stop-N-Go who had other unsecured creditors and at that time owed no money to Eastern guaranteed the debt of Maple to Eastern by giving Eastern security in just about everything Stop-N-Go owned. The Security Agreement was properly filed. On the day following that guarantee, the total debt owed by Maple to Eastern was $804,298.46. This guarantee by Stop-N-Go of Maple's debt, if it were called upon to pay it, would render Stop-N-Go insolvent.

In the meantime, the Department of Agriculture of the State of New York, as a result of reports filed by Eastern with the Department of Agriculture, had commenced an action against Maple to revoke its license to process milk. In November of 1978, to close out this action, Stop-N-Go consented that the proceeds of its then contract with the Southland Corporation be assigned to Eastern in payment of Stop-N-Go's guarantee of Maple's debt and in payment of Maple's debt to Eastern. Stop-N-Go during this entire period of time was buying milk from Maple under its d/b/a All Star Dairy. They were buying approximately 70% of the milk produced by Maple.

After one adjourned closing, the Southland deal to purchase Maple and Stop-N-Go was closed on December 29, 1978. At that time, Southland and its attorneys insisted that all secured debts be paid. Southland Corporation and Taylor Car Leasing Company, a wholly owned subsidiary, had transferred to Marine Midland Bank a total amount of $2,272,492.96 to be available for the purchase of Maple and Stop-N-Go. During the day of December 29, 1978, an inventory was taken to determine the amount to be paid by Southland and its subsidiary, Taylor. The physical inventory figure taken on that day was substantially below the June 30th physical inventory amount which had been used as a guide for the Stop-N-Go figures. The deal was consummated and from the buyer's escrow fund the following transfers were made. An escrow account was established at Marine Midland Bank of $42,000. Two deposits were made to Stop-N-Go totaling $1,649,226.81. A deposit was made to Maple's account of $257,097.55 and a wire transfer was made to the Dallas headquarters of Southland Corporation and Taylor Car Leasing of the balance of $324,168.60. At the same time, checks were certified and issued to secured creditors. Stop-N-Go's secured creditors got $945,266.05. Maple's se-

cured creditors, including Eastern, got $1,042,665.08. There was a transfer by Stop-N-Go to Maple of $723,915.07 in checks by Stop-N-Go to All Star Dairy, the d/b/a of Maple and a check from Stop-N-Go for $61,652.46 to cover the shortfall of Maple's payment to Eastern. Eastern received in all a total of $811,995.99 in certified checks from Maple and received in return a release of Maple's debt to Eastern. After the payments by Stop-N-Go, over a $1,000,000 worth of unsecured creditors of Stop-N-Go, had about $6,000 to split up amongst themselves. These creditors filed an involuntary petition for Stop-N-Go on January 30, 1979. Subsequently, Stop-N-Go was adjudicated and John B. Lawless was elected trustee by the creditors.

Based upon this set of facts, the trustee is seeking to recover $785,567.33 from Eastern on the theory that there was a preference and or a fraudulent transfer. Eastern, on the other hand, is claiming that they had a lien upon the assets of Maple pursuant to a 1977 security agreement. The Southland contract required that Eastern be paid in full and its lien on Maple satisfied prior to closing. They received no money from Stop-N-Go and Maple paid off the secured claim of Eastern so that the Southland deal could go through. They claim there was no preference and no fraudulent transfer. Eastern also challenges the jurisdiction of this Court to hear this case under *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The three individual defendants put in no testimony and really did not participate in the trial.

In pertinent part, § 67(d)(2) of the Bankruptcy Act (11 U.S.C. § 107) reads as follows:

"Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; ..."

(5) For the purposes of this subdivision d, a transfer shall be deemed to have been made at the time when it became so far perfected that no bona fide purchaser from the debtor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein, ...

(6) A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this Act, which is fraudulent under this subdivision d against creditors of such debtor having claims provable under this Act, shall be null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value: ...

Section 60 of the Bankruptcy Act (11 U.S.C. § 96) provided in part as follows: a. (1) A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

(2) ... a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee....

(b) Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent....

■ With regard to the jurisdictional question raised by Eastern, it should be noted, that this case was commenced under

the Bankruptcy Act and Eastern in accordance with the provisions of that Act consented to jurisdiction of this Court by failing to challenge jurisdiction until the commencement of the trial. Section 403 of the Bankruptcy Reform Act of 1978 reads in part as follows:

(a) A case commenced under the Bankruptcy Act, and all matters and proceedings in or relating to any such case, shall be conducted and determined under such Act as if this Act had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter or proceeding as if the Act had not been enacted.

■ In this case, the first transfer by Stop-N-Go to Eastern occurred on September 29, 1978. It was at this point in time that Stop-N-Go guaranteed the Maple debt to Eastern. At that time, Stop-N-Go owed nothing to Eastern and according to the testimony of Eastern's Mr. Dorn, received nothing from Eastern for the guarantee of the debt of Maple. The U.C.C.'s covering the security were filed October 10, 1978 in Chemung County and October 24, 1978 in the Secretary of State's Office in Albany. While it might be argued that this transaction was not a preference because Eastern was not a "creditor" and, at least, the transaction was initiated outside of the four month period (one day before), there can be no argument that this transaction clearly falls within the purview of § 67 of the Bankruptcy Act because here was a obligation incurred within a year of the filing in bankruptcy, while unsecured creditors existed, without fair consideration and the transaction rendered the debtor insolvent. Therefore, in the language of the statute this transaction "shall be null and void against the trustee." (Supra § 67).

■ The next transfer made by Stop-N-Go to Eastern occurred in November of 1978 when to settle the law suit by the New York State Department of Agriculture against Maple with regard to its license, Stop-N-Go, gave Eastern an assignment of the proceeds of its sale to Southland. Stop-N-Go received nothing for this transaction and again you have a transaction voidable as to the trustee under § 67 (supra) because the obligation was incurred within a year, other unsecured creditors existed, and there was no consideration given to the debtor, who was insolvent.

In addition, this transfer violated § 60 (supra) because here there was a transfer to an unsecured creditor, within four months, while the debtor was insolvent and the transfer enabled the then unsecured creditor, Eastern, to obtain a greater percentage of the debt than some other creditor of the same class. Clearly, the assignment can be avoided as a preference.

■ The third and final transfer occurred according to the trustee at the closing on December 29, 1978. This was when the $785,567.33 was transferred by Stop-N-Go to Maple by various checks. Checks totaling $723,915.07 representing the money owed by Stop-N-Go to Maple for milk purchased during 1978 and bearing various dates during that year was paid to Maple under its d/b/a All Star Dairy by Stop-N-Go. The remaining $61,652.46 check paid to Maple was to cover the short fall of Maple's payment to Eastern, which payment was in the amount of $811,995.99. The question is were these payments a preference or fraudulent as between Stop-N-Go and Eastern.

The leading case on indirect payments is *National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 where the Court said at page 184, 32 S.Ct. at page 635:

To constitute a preference, it is not necessary that the transfer be made directly to the creditor. It may be made to another, for his benefit. If the bankrupt has made a transfer of his property, the effect of which is to enable one of his creditors to obtain a greater percentage of his debt than another creditor of the same class, circuity of arrangement will not avail to save it. A "transfer" includes "the sale and every other and different mode of disposing of or parting with property, or the possession of prop-

erty, absolutely or conditionally, as a payment, pledge, mortgage, gift, or security." . . . It is not the mere form or method of the transaction that the act condemns, but the appropriation by the insolvent debtor of a portion of his property to the payment of a creditor's claim, so that thereby the estate is depleted and the creditor obtains an advantage over other creditors . . . and if an insolvent debtor arranges to pay a favored creditor through the disposition of such an account, to the depletion of his estate, it must be regarded as equally a preference, whether he procures the payment to be made on his behalf by the debtor in the account,—the same to constitute a payment in whole or part of the latter's debt,—or he collects the amount and pays it over to his creditor directly. This implies that, in the former case, the debtor in the account, for the purpose of the preferential payment, is acting as the representative of the insolvent, and is simply complying with the directions of the latter in paying the money to his creditor. . . . "These transfers of property, amounting to preferences, contemplate the parting with the bankrupt's property for the benefit of the creditor, and the consequent diminution of the bankrupt's estate." . . .

The cases which have followed the law expressed in *National Bank of Newport v. National Herkimer County Bank,* (supra) have varied results depending upon the facts.

■ Examples abound, for instance the Courts look to substance rather than the form of the transactions. *Steel Structures v. Star Manf. Co.,* 466 F.2d 207, 217–218 (6th Cir.1972). Where a fraudulent or preferential scheme is involved, the Courts must be vigilant. See *Jackson v. Star Sprinkler Corp. of Florida,* 575 F.2d 1223, 1226 (8th Cir.1978); *In re Roscar Steel Scrap and Metals Corp.,* 12 B.R. 629, 633 (Bkrtcy.S.D. N.Y.1981). Courts must assess the facts in light of equitable principles, *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966) and should undo

a scheme whose basic nature is preferential and fraudulent, despite a technical facade of legality. *Pepper v. Litton,* 308 U.S. 295, 312, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939). A sophisticated creditor deeply involved in the financial woes of a debtor's parent or subsidiary and well aware of the close relationship between the two corporations is "on inquiry" with respect to matters affecting the debtor's financial condition and the creditor is chargeable with knowledge that a transaction will render the debtor insolvent. *In re Ollag Constr. Equip. Corp.,* 578 F.2d 904 (2d Cir.1978); *Miller v. Wells Fargo Bank Int'l Corp.,* 406 F.Supp. 452, 464–65 (S.D.N.Y.1975), affd. 540 F.2d 548 (2d Cir. 1976). An indirect transfer is preferential if the intermediary acts as representative of the insolvent and complying with the insolvent's direction, pays the money to or for the benefit of the creditor. See *Dean v. Davis,* 242 U.S. 438, 441, 443, 37 S.Ct. 130, 131, 61 L.Ed. 419 (1917), *Miller v. Wells Fargo Bank Int'l Corp.,* 406 F.Supp. 452, 463, n. 2 (S.D.N.Y.1975), affd. 540 F.2d 548 (2d Cir.1976).

The main issue in indirect preferential transfer cases is whether the debtor's estate is depleted and whether the transferee of the debtor acts independently or as the debtor's agent. See *Kapela v. Newman,* 649 F.2d 887 (1st Cir.1981); *Grubb v. General Contract Purchase Corp.,* 94 F.2d 70 (2d Cir.1938); *In re Roscar Steel Scrap and Metals Corp.,* 12 B.R. 629, 633 (S.D.N.Y. 1981); *In re Darke,* 18 B.R. 510, 513 (Bkrtcy. E.D.Mich.S.D.1982); *In re Moskowitz,* 13 B.R. 357, 359 (Bkrtcy.S.D.N.Y. 1981), appeal denied 14 B.R. 307 (S.D.N.Y. 1981), trial 14 B.R. 677 (S.D.N.Y.1981).

In this case, if we look to substance rather than form, there are two companies operated by three men, Butler, Woodhull and Creighton, and they are treated by the three men almost as one company. The dairy, Maple, is in debt to Eastern for roughly $800,000. Eastern through its financial manager, Dorn, is worried about Maple's debt and when he, and through him Eastern, find out that Maple and Stop-N-Go are going to be sold persuades Butler, the

president of both companies, to have Stop-N-Go guarantee the debt of its parent, Maple. At the closing, Maple does not have sufficient assets to pay the debt of Maple to Eastern. A transfer is made from Stop-N-Go to Maple to enable the payment to be made. Stop-N-Go's estate is depleted and all its other unsecured creditors are left to scrounge for pennies while Eastern, who had improved its position at their expense, walks away with a hundred cents on the dollar. The payment of the money on December 29, 1978 was an indirect preference. Therefore, Stop-N-Go is entitled to receive back $785,567.33 from Eastern as a preference and a fraudulent transfer. Since there was no proof offered against the individual defendants and no transfer made to them, the case is dismissed as to them and it is so ordered.