In re WATERSIDE CONSTRUCTION
CO., INC., Debtor.

HEATH MANAGEMENT CO.,
INC., Plaintiff,

v.

GUARANTY–FIRST TRUST COMPANY,
and Waterside Construction Company,
Inc., Defendants.

Bankruptcy No. 89–12833–HAL.
Adv. No. 89–1554.

United States Bankruptcy Court,
D. Massachusetts.

March 7, 1990.

---

Robert S. Marcus, Marcus Associates, Boston, Mass., for plaintiff.

Steven J. Marullo, Marullo & Barnes, Boston, Mass., for defendant/debtor.

Richard A. Savrann, Singer, Stoneman, Kunian & Kurland, Boston, Mass., for defendant Guaranty–First Trust Co., Inc.

## DETERMINATION OF MORTGAGE STATUS

HAROLD LAVIEN, Bankruptcy Judge.

This complaint by a junior mortgagee, Heath Management Co., Inc., ("Heath") challenges a second, third, and fourth mortgage held by the Guaranty–First Trust Company ("Guaranty") on the debtor's property and seeks damages on a third-party beneficiary type theory. Aside from the effect of damages, the bank's first mortgage does not appear to be seriously in dispute by this plaintiff.

Although not directly relevant, the casual manner in which the bank authorized a construction loan of $1,463,000 without any plans, specifications, or budget, graphically illustrates why the banking industry is in trouble and replaces the conservative banker's images with that of a novice gambler who does not even have the restraint occasioned by the use of other people's money.

The gravamen of this present controversy surfaced when the elder and more prominent of the debtor's stockholders suddenly died with construction incomplete, construction loan money substantially exhausted, work stopped and payments in or approaching default. The gambler's nerve broke, panic set in and the bank sought desperately to bail out.

After the construction mortgage to the debtor in June 1986, the bank gave three loans to three trusts jointly owned by Shapiro, the moneyed, experienced developer who died in December of 1988 and, Matt, his young associate who handled the day-to-day construction. Each of these loans was guaranteed by a real estate mortgage on the debtor's real estate.

12/29/86—Mortgage in the amount of $230,000 to guarantee the obligations of William T. Matt, Trustee of Willow Street Realty Trust

12/31/86—Mortgage in the amount of $230,000 to guarantee-the obligations of William T. Matt, Trustee of 17–40 Realty Trust

5/7/87—Mortgage in the amount of $1,750,000 to guarantee the obligations of William T. Matt, Trustee of Foxboro Motel Realty Trust

The mortgages on their face recited that the mortgage was given in order to secure the mortgagor's guarantee of the obligations of William T. Matt, Trustee of each of the respective trusts. In fact, no money from these loans was intended to be for nor did any come to the debtor, nor was any used for its benefit. Both the bank and the debtor were fully aware of this. The most the bank's representative testified to was that as to the Foxboro loan, there was some intimation that the debtor would be involved in the construction. There was no basis for this, it did not happen, and no one represented to the bank that it would. Since these mortgages totalled $3,673,000., and under the most optimistic appraisals, the debtor's only property was valued,

when completed, at only $2,160,000, the debtor was rendered insolvent by those collateral mortgages and, in any event, is clearly insolvent now.

 Courts have long held that "powers of an ordinary business corporation do not include the power to guarantee the obligations of another corporation, unless it can be shown that such a power is fairly incidental or auxiliary to the main business of the corporation and is necessary or expedient in the protection, care and management of its property". *In re Duncan & Goodell Co.*, 15 F.Supp. 550, 551 (1936). In addition, while addressing the question of whether a corporation's action are Ultra Vires and unenforceable, the Courts have stated that:

> every person who énters into a contract with a corporation is bound at his peril to take notice of the legal limits of its capacity, especially where, as in this commonwealth, all acts of incorporation are deemed public acts, and every corporation who is organized under General Laws is required to file in the office of the Secretary of the Commonwealth a certificate showing the purpose for which said corporation is constituted.

*Davis v. Old Colony Railroad*, 131 Mass. 258 (1898); *see also, Wiley & Foss, Inc. v. Saxony Theatres*, 335 Mass. 257, 139 N.E.2d 400 (1957).

The Court in *Davis*, *supra*, went on to state:

> when the corporation has actually received nothing in money or property, it cannot be held liable upon an agreement to share in, or to guarantee the profits of, an enterprise which is wholly without the scope of its corporate powers, upon the mere ground that conjectural or speculative benefits were believed by its officers to be likely to result from the making of the agreement, and that the other party has incurred expenses upon the faith of it. *Id.* at 275.

The common law rule is clear. Ordinary business corporations are without authority to guarantee debts of another, *without consideration or benefit to the corporation*, and that such a contract cannot be enforced against the corporation. *Limerick Mills v. Royal Textile*, 288 Mass. 479, 193 N.E. 9 (1934); *Bennett v. Corporation Finance Co., Inc.*, 258 Mass. 306, 154 N.E. 835 (1927); *Boston Box Co., Inc. v. Shapiro*, 249 Mass. 373, 144 N.E. 233 (1924); *Davis v. Old Colony Railroad*, 131 Mass. 258 (1898).

On July 1, 1986, the Massachusetts Legislature enacted a statute which clarified and restated the common law of this Commonwealth.

M.G.L.A. c. 156B, sec. 9B codified the common law rule that a corporation has no power to guarantee the obligations of another corporation, unless it can be shown that such a power is necessary or expedient in the protection of that corporation. The statute states that:

> A corporation may make contracts of guarantee and suretyship, whether or not in furtherance of the contracting corporation's purposes, provided, however, that such contracts are necessary or convenient to the conduct, promotion or attainment of the business of (a) a corporation all of the outstanding stock of which is owned, directly or indirectly, by the contracting corporation, (b) a corporation which owns, directly or indirectly, all of the outstanding stock of the contracting corporation, or (c) a corporation all of the outstanding stock of which is owned, directly or indirectly, by a corporation which owns, directly or indirectly, all of the outstanding stock of the contracting corporation; provided, however, that the board of directors of the contracting corporation has determined that such contracts are necessary or convenient to the conduct, promotion or attainment of the business of the contracting corporation. M.G.L.A. c. 156, sec. 9B.

The evidence in this case clearly establishes that debtor never received money or any other benefits, direct or indirect from any of the mortgages debtor granted on December 29 and 31, 1986 and on May 7, 1987, respectively. Therefore, these mortgages are Ultra Vires and void as a matter of law.

■ Not to unduly prolong this opinion, the Court also notes these second, third, and fourth mortgages would be void as fraudulent conveyances under 11 U.S.C. § 544 and Mass. Gen. Laws ch. 109A, under which intention is not necessary. Clearly, there was no fair consideration and the debtor was rendered insolvent by these transfers, all of which occurred within the state statute of repose. *In re Roco*, 701 F.2d 978 (1st Cir.1983); *Branch v. Steph*, 389 F.2d 233 (10th Cir.1968); *Reiner v. Washington Plate Glass Co., Inc.*, 27 B.R. 550, 8 C.B.C.2d 707, 10 B.C.D. 827 (D.O.C. 1982); *Matter of Ohio Corrugating Co.*, 70 B.R. 920 (Bankr.N.D.Ohio 1987); *In re Kaiser Steel Corp.*, 105 B.R. 639 (Bankr. Colo.1989).

■ After all four mortgages were on record at the Registry of Deeds, the plaintiff made two loans to the debtor allegedly to enable it to complete the project, although there is little evidence that the funds were so used. The plaintiff contends that debtor told him that Heath has nothing to fear from the second, third, and fourth mortgages, but there is no contention of any contact with the bank or any agreement with the bank to subordinate them. Two mortgages were given by the debtor to Heath:

7/29/88—Mortgage in amount of $250,000

8/10/88—Mortgage in amount of $140,000

However, by mid-December 1988, when Shapiro was stricken, the project was not complete and no construction was taking place. Four condominium units had been sold and eight were in various stages of completion. It was estimated to take approximately $100,000 to complete them. There was also added land awaiting development. Of the $1,463,000 construction loans, $1,447,135.22 had been drawn down, leaving potentially available only approximately $16,000. The December interest payment due on the first was approaching default although it should be noted that while Shapiro was alive, payments were generally late but somewhat reluctantly accepted with late charges but without serious complaint. Payments were also late on the other three loans as well as the Heath mortgages.

To this point, the basic facts are substantially agreed. The balance of the dispute turns on the conflicting testimony as to what happened after Shapiro was stricken. It is agreed that Matt and Louis Chaitman, Vice President and the senior loan officer of the bank, had several conversations during the last days of December 1988 and January and February 1989 in which Chaitman had become extremely concerned about the completion of the project and payment, while Matt, in order to save the projects, needed to forestall foreclosure and obtain financing to complete the projects on which little work had been done since the last requisition in August 1988. The mortgages to Heath were also in default and Paul F. Roiff, Heath's President, was also threatening foreclosure. Matt claims that Chaitman said that if he brought the interest current, the bank would resume funding and give him time and that this conversation was repeated when he telephoned from Heath's office and that Roiff was able to hear the conversation because he was using a speaker phone. When questioned as to exactly what Chaitman said, it was simply, "Billy bring in the cash." Chaitman acknowledges several conversations in person and over the telephone but denies that he consciously participated in any speaker phone conversation and never one in which he was made aware that Roiff was listening, let alone participating. He contends that he always urged Matt to pay the interest on all of the projects and to find a way to complete them but denies ever promising additional funding on this debtor's project beyond the approximate $16,000 still available and even as to that, only if work went forward.

Roiff contends that in reliance on the conversation he overheard on the speaker phone between Matt and Chaitman, Heath issued its check for $17,994.22 dated January 9, 1989 payable not to the bank, or the debtor, but to Southeast Transportation Corp., another entity, the stock of which was owned equally by Shapiro and Matt.

In fact, the check was endorsed over to and deposited in the mortgage department of the bank on January 10, 1989. From the proceeds, $9,523.93 was applied to the December interest on the debtor's construction mortgage, $2,160.40 went to Shapiro's account, and the balance to three other entities. On January 18, 1989, the bank sent the debtor a notice that the January 1st payment was late and that foreclosure would result if payment of interest was not made in 15 days. On February 7, 1989, Southeast Transportation Corp. made another interest payment with 19 $500 American Express money orders. This was the last payment assumedly supplied by Heath. A payment was made in July but there is dispute as to whether any of it related to this debtor. On August 23rd, 1989 a deficiency notice was sent by the bank of intent to foreclose on or after September 22, 1989. While the evidence is conflicting, I find that Chaitman only agreed with Matt to forestall foreclosure if interest payments were kept current. Since the payments were for December 1988 and January 1989 and the notice called for September foreclosure, the bank was not in breach of any agreement with Matt. Payments were not kept up after the February payment which was a belated January payment. No substantial construction took place because Matt could not obtain financing now that Shapiro was no longer alive. Chaitman could not have equated interest payments with further funds since there was only $16,000 left in the construction reserve and even that would only be released on a requisition based on post-August construction. Except for vague general allegations of Matt, there was no credible evidence of any new construction on this project not already paid for by the bank and no unpaid requisitions.

There was, for the first time, some direct negotiations between Roiff and Chaitman in the Spring of 1989. That appeared to center on the potential of an agreement for Roiff to pay off the debtor's construction mortgage but the bank withdrew its agreement and Roiff never tendered payment or took any further action to take over the bank's position. Roiff's actions were as haphazard as the bank's. If it issued its original mortgages solely on the strength of the debtor's property—a matter of some dispute—he made no effort to consult the bank as to any willingness to subordinate the second, third, and fourth mortgages of which Roiff was fully aware. If the funds were to complete the debtor's project, there is no indication of any effort to see that the funds were, in fact, used for the debtor's project. The 1989 two added loans are clearly made to Southeast Transportation Corp. and not to the debtor. When asked why, the answer clearly indicates that Roiff was not placing his reliance on any alleged overheard telephone conversation between Chaitman and Matt. The loan was to Southeast Transportation Corp. because they were more financially sound and it was expecting the insurance proceeds on Shapiro's life. Of course, it was in the interests of a very junior mortgagee to hold off the senior mortgagee until the dust settled to see if Matt could complete the project. When that became doubtful, Roiff finally sought direct negotiations with the bank. Like everything else in this matter, nobody believes that the shortest distance between two points is a straight line. Roiff proposed a purchase of the bank's position as one of several possibilities—the bank, at first, accepted and then rejected this idea, and Roiff never, with any tender or any further attempt to carry out the purchase, immediately adopted an adversarial position of challenge to the bank's position, which is where we are now.

At this moment, as between these three parties, the bank has a valid first mortgage and Heath has a valid second and third mortgage period. Heath has no claim against the bank on any direct, or implied, or third-party beneficiary theory.