In re **BOSTON REGIONAL MEDICAL CENTER, INC.,** Debtor.

**Boston Regional Medical Center, Inc., Plaintiff,**

v.

**Seventh Day Adventist Hospital Retirement Fund, Trustee, General Conference Corporation of Seventh Day Adventists, Defendant.**

**Bankruptcy No. 99–10860–CJK. Adversary No. 01–1080.**

United States Bankruptcy Court, D. Massachusetts.

April 22, 2003.

Lawrence Crowley, Jr., Esq., Boston, MA, for Boston Regional Medical Center, Inc.

Brian D. Gwitt, Esq., Indianapolis, IN, Jean M. Kelley, Esq., Boston, MA, for Seventh Day Adventist Hospital Retirement Fund, Trustee, General Conference of Seventh Day Adventists, for Parties.

## MEMORANDUM OF DECISION

CAROL J. KENNER, Bankruptcy Judge.

This adversary proceeding was brought to recover a preference under § 547 of the Bankruptcy Code. What is unusual is that distributions took a rather circuitous path involving five separate entities. The decision turns on whether the distributions were property of the Debtor's estate.

### Background and Facts:

Boston Regional Medical Center, Inc., the Debtor, is a Massachusetts nonprofit corporation that operated a hospital in Stoneham, Massachusetts. The Seventh Day Adventist Hospital Retirement Fund (the "Fund") administers a retirement and health insurance plan in which the Debtor participated. As a participant, the Debtor was required to make contributions to the plan. As of March 31, 1998, the Debtor owed the Fund $1,818,235 for unpaid retirement and health insurance contributions.

Atlantic Adventist Healthcare Corporation ("AAHC") oversees and coordinates the activities of multiple Seventh Day Adventist healthcare entities operating within the Atlantic region, including the Debtor.

Pursuant to a participation agreement, AHS Liability Trust ("Trust") was established to insure medical malpractice liability claims arising in the Seventh Day Adventist healthcare system. The Trust was funded by payments made by Debtor and other participating hospitals. However, AAHC was ultimately responsible for making Debtor's payments to the Trust in the event that Debtor failed to make those payments. Also, according to the terms of the participation agreement, if excess funds were collected, they were to be returned to AAHC (and the other regions) but not to the individual hospital facilities (including the Debtor). Healthcare Excess Liability Management Cooperative ("HELM") is the entity responsible for returning any excess funds.

By correspondence dated November 11, 1998, HELM informed AAHC that excess medical malpractice insurance policy proceeds were going to be distributed to AAHC (the "HELM Distribution"). Subsequently, the Debtor, AAHC and the Fund entered into a settlement agreement whereby (i) AAHC guaranteed the $1,818,235 obligation of the Debtor owing to the Fund, which was reduced to $1,500,000 by the terms of the agreement (the "Guaranty"), and (ii) AAHC and the Debtor assigned to the Fund "all of their right, title and interest, if any" to the HELM Distribution (the "Settlement Agreement").[1] In connection with the Guaranty, AAHC granted the Fund a security interest in certain collateral. Then, on November 23, 1998, HELM's agent made the HELM Distribution by check payable to the order of AAHC in the amount of $1,012,168. AAHC endorsed the check over to the Fund.

Frances Crunk, the chief financial officer of the Debtor and AAHC, gave the following accounting instructions to reflect the effect of the HELM Distribution: (i) on the Debtor's books, an account payable liability to the Fund was reduced by $1,012,168 and an account receivable from AAHC was correspondingly reduced (the "Account Receivable")[2]; and, (ii) on

---

1. Boston Regional Medical Associates, Inc., was also a party to the Settlement Agreement.

2. There is a dispute regarding the Account Receivable. The Debtor asserts that it routinely paid the executive compensation for officers of AAHC and that AAHC typically reimbursed the Debtor for those expenses at year end. Debtor states that the Account Receivable relates to these expenses. In contradiction, Ms. Crunk testified that it was

AAHC's books, an account payable liability to the Debtor was reduced by $1,012,168.[3]

The Debtor now seeks to recover from the Fund as preferential transfers (i) the HELM Distribution to which it asserts it was entitled and (ii) the Account Receivable. Debtor brought this adversary proceeding against the Fund, as the ultimate recipient of the HELM Distribution. However, AAHC is not a party to this proceeding (and to the Court's knowledge no independent action was brought against AAHC to avoid and recover the transfers at issue here) and the Court does not hereby adjudicate AAHC's rights.

I held a trial on the matter on November 8, 2002. The parties agreed in their joint pretrial statement to certain key facts. The Debtor filed a liquidating plan of reorganization that was confirmed and now, pursuant to authority granted in the plan, is liquidating claims for the benefit of its creditors.

*Discussion:*

Pursuant to the Bankruptcy Code, with exceptions that are not at issue here,

"the trustee may avoid any transfer of an interest of the debtor in property–

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made–

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the

petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if–

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

11 U.S.C. § 547(b).

## A. *Interest of the Debtor in Property.*

■ "A preference does not take place unless the transaction involves a 'transfer of an interest of the debtor in property.'" *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply),* 100 B.R. 127, 133 (Bankr.D.Mass.1989) (citation omitted). The Fund argues that the property used to make the payment by AAHC, the HELM Distribution, is not "an interest of the debtor in property." To prove otherwise, the Debtor must ultimately establish, by a preponderance of the evidence, (i) that it had an interest in the HELM Distribution and (ii) that the payment was made for its benefit and not in satisfaction of an independent obligation owing by AAHC to the Fund, namely the Guaranty. *See Ralar Distributors, Inc. v. Rubbermaid, Inc. (In re Ralar),* 4 F.3d 62, 67 (1st Cir.1993); *Tri–Co., Inc. v. Star Bldg. Sys. (In re Tri–Co., Inc.),* 221 B.R. 606, 609 (Bankr.D.Mass.1998).

AAHC that paid the executive compensation for officers of both AAHC and the Debtor. The Fund argues further that the Account Receivable was merely a placeholder in case the Debtor was sold to a third party who did not want to purchase certain assets but which AAHC agreed to purchase in the event the

sale was consummated. Because of my findings and rulings below, it is unnecessary to resolve this dispute.

3. Presumably, a corresponding reduction was made to the account receivable from HELM.

**HELM Distribution**

■ "A prepetition debtor acquires 'rights' in property for section 547(b) purposes *if, but for* the challenged transfer, its interest would have been 'property of the estate' under section 541 at the filing of a chapter 7 petition." *Id.,* 4 F.3d at 67 (emphasis in original) (citing *Begier v. Internal Revenue Service,* 496 U.S. 53, 58, 58 n. 3, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990)).

■ In some of its filings with the Court, the Debtor asserts a property interest in the HELM Distribution based on a recital in the Settlement Agreement (to which HELM was not a party) stating that AAHC and Debtor "are entitled to certain distributions constituting the return of certain insurance policy proceeds" from HELM. However, in its answers to the Fund's second request for admissions, admitted into evidence at trial, the Debtor admits that it was not directly entitled to the HELM Distribution. Also, at trial, when the Court queried Debtor's counsel whether it was his position that the Debtor had some interest in the HELM Distribution, he responded "[n]o, your honor." Yet, in its post-trial brief, Debtor again asserts an interest in the HELM Distribution.

Charles S. Ricks, D.D.S., President and Chief Executive Officer of the Debtor and of AAHC when the HELM Distribution was made and transferred to the Fund, Frances H. Crunk, Chief Financial Officer of the Debtor and of AAHC when the HELM Distribution was made and transferred to the Fund, and Thomas Wetmore, associate general counsel to the General Conference of Seventh–Day Adventists when the HELM Distribution was made and transferred to the Fund, each testified that the Debtor had no right or entitlement to the HELM Distribution and that AAHC did. Victor Wayne Taylor,

President of HELM, testified at trial that pursuant to a 1991 reorganization of the Seventh Day Adventist healthcare self-insurance system, HELM "ceased having any privity of contract with the individual hospitals." The agreement defining HELM's obligation to return excess funds specifies that those funds "may be returned...to the Regions by payment of such excess funds to their Regional Trusts." AAHC (which changed its name from North Atlantic Corporation) is defined in the agreement as a Region. Northern Trust Company is the trustee of each of the Regional Trusts. Northern Trust Company, as HELM's agent, cut the check representing the HELM Distribution made to AAHC. Also, pursuant to the agreement, the Debtor would be termed a Facility, but not a Region.

There is no evidence before the Court of an obligation undertaken by HELM to remit the HELM Distribution to the Debtor or of an assignment of AAHC's rights to such payment to the Debtor. Accordingly, I find that Debtor has failed to establish by a preponderance of the evidence that it had a direct interest in the HELM Distribution.

**Account Receivable**

■ There remains the question of whether the reduction of the Account Receivable indirectly benefitted the Fund such that a preferential transfer may have occurred. *See Ralar Distributors, Inc.,* 4 F.3d at 66. In other words, if the transfer of the HELM Distribution from AAHC to the Fund were merely gratuitous (e.g. if the Guaranty is invalid) then the corresponding reduction in the Account Receivable would indirectly benefit the Fund such that it would be a preferential transfer from the Debtor to the Fund.

[I]f an insolvent debtor arranges to pay a favored creditor through the disposi-

tion of ... an account [receivable], to the depletion of his estate, it must be regarded as equally a preference, whether he procures the payment to be made on his behalf by the debtor in the account... or [he] collects the amount and pays it over to his creditor directly. This implies that, in the former case, the debtor in the account, for the purpose of the preferential payment, is acting as the representative of the insolvent, and is simply complying with the directions of the latter in paying the money to his creditor.

*Nat'l Bank of Newport v. Nat'l Herkimer County Bank,* 225 U.S. 178, 184, 32 S.Ct. 633, 56 L.Ed. 1042 (1912).

However, so long as the payor has an independent obligation to the payee, no preference will be found. *Id.* at 185, 32 S.Ct. 633. For instance, in *Nat'l Bank of Newport,* the trustee sought to avoid the following transaction as a preference from the Newport Knitting Company to the Herkimer Bank:

The Newport Knitting Company gave to the Herkimer Bank a three-months note, indorsed by the Titus Sheard Company and secured by the delivery to the bank of assignments of the bills receivable to the latter company amounting to $6,300. Before the maturity of the note the Titus Sheard Company paid to the bank the amount of it, less accrued interest, and took up the note and the collateral. The payment was made by the Titus Sheard Company, acting in its own behalf, by a check drawn against funds to its credit in the bank. The amount it paid was then charged by it to the Newport Knitting Company, to which it was indebted on open account in a larger sum than the amount of the note. This offset was not shown to have been known to the bank.

*Miller v. Fisk Tire Co.,* 11 F.2d 301, 303–04 (D.Minn.1926). The Court found that this did not amount to a preference because:

the payment to the bank did not proceed from the bankrupt, the Newport Knitting Company. The Titus Sheard Company had a standing quite apart from its relation to the Newport Knitting Company as a debtor in the account. In the transaction with the bank, the Titus Sheard Company acted on its own behalf. As the holder of the original note, that company had indorsed it to the bank, taking for its own benefit the proceeds of the discount. Its obligation as indorser was continued by the renewals, and to secure the bank on the last renewal, it had deposited its own collateral. It took up the note with its own funds and received back security. Neither directly nor indirectly was this payment to the bank made by the Newport Knitting Company, and the property of that company was not thereby depleted.

*Nat'l Bank of Newport,* 225 U.S. at 185, 32 S.Ct. 633. "*Nat'l Bank of Newport* continues to control under the present Bankruptcy Code; there is nothing in the legislative history of § 547 to the contrary." *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 133 (Bankr.D.Mass.1989). Thus, if AAHC's Guaranty is enforceable, then it has an independent obligation to the Fund which will defend it against the Trustee's preference action. *See also Tri–Co., Inc. v. Star Bldg. Sys. (In re Tri–Co., Inc.),* 221 B.R. 606 (Bankr.D.Mass.1998) (no preference found where entity contingently liable on Debtor's liability to third party made payment from its own funds to third party, even though there was a corresponding reduction in the account receivable of the Debtor from the entity); *Miller v. Fisk Tire Co.,* 11 F.2d 301 (D.Minn.) (no preference found where guarantor made pay-

ment with his own funds to third party, satisfying obligation of guarantor, even though debtor reimbursed guarantor).

### Validity of the Guaranty

The Debtor claims that AAHC's by-laws did not empower AAHC to grant the Guaranty and that AAHC received no consideration from the Fund for the Guaranty so that the Guaranty is unenforceable.

AAHC is a Massachusetts non-profit corporation. Article III, section 4, subsection (e) of its By–Laws reads:

> Notwithstanding for [sic] foregoing, the Board shall have no power to borrow money, make guarantees, or otherwise incur indebtedness (either on behalf of the Corporation or on behalf of any entity controlling, controlled by or affiliated with the Corporation) other than unsecured short term obligations in the nature of trade payables and similar obligations incurred on behalf of the Corporation.

■ However, Article Four of the Articles of Organization of AAHC provides that:

> [i]n addition to, and not limited by, the general powers conferred by the Commonwealth of Massachusetts under the Massachusetts General Laws, the Corporation shall have the power to carry on any other lawful business that is of benefit to the Corporation under the laws of [Massachusetts] in respect to non-profit corporations.

The Massachusetts legislature granted non-profit corporations the power to "give guarantees" if doing so is "necessary or expedient" in protecting a related corporation. Mass.Gen.Laws ch. 156B, §§ 9(h), 9B; Mass.Gen.Laws ch. 180, § 6; *Heath Mgmt. Co., Inc., v. Guaranty–First Trust Co. (In re Waterside Const. Co., Inc.)*, 116 B.R. 9, 11 (Bankr.D.Mass.1990). Thus, under its charter, AAHC has authority to

grant certain guarantees. *See New England Merchants Nat'l Bank v. Lost Valley Corp.*, 119 N.H. 254, 400 A.2d 1178, 1180 (1979) (under Massachusetts law, a corporation is empowered to grant guarantees so long as the charter contains no prohibition, even if its charter is silent on the issue).

"The articles of organization establish the purposes and governance of a corporation...and where bylaws are in conflict with the articles, the by-laws being subordinate, the articles of organization control." Mass.Gen.Laws. ch. 156B, § 16, made applicable by Mass.Gen.Laws. ch. 180, § 6A; *Primate and Bishops' Synod of the Russian Orthodox Church Outside Russia v. Russian Orthodox Church of the Holy Resurrection*, 35 Mass.App.Ct. 194, 617 N.E.2d 1031, 1035 (1993) (internal citation omitted). Therefore, because of the authority evident in its Articles of Organization, I find that AAHC had authority to grant a guaranty.

■ Nevertheless, that authority may only be exercised if "necessary or expedient" in protecting a related corporation and if, in exchange, the granting corporation receives "consideration or benefit." *Heath Mgmt. Co., Inc.*, 116 B.R. at 11. Both parties agree that AAHC and the Debtor are affiliated entities and do not dispute the necessity of the Guaranty. Debtor argues, though, that AAHC received no consideration from the Fund for its guaranty of the obligations owing by the Debtor to the Fund. The Fund rebuts this by pointing to language in the Settlement Agreement stating that AAHC and Debtor "will receive a direct and material financial benefit from the accommodations extended by the Fund" (namely the reduction of the obligation to the Fund to $1,500,000) and that each of AAHC and Debtor "has received reasonably equiva-

lent value constituting full consideration in exchange for their respective execution of this agreement."

Pursuant to its terms, the Settlement Agreement is to be construed and interpreted in accordance with Massachusetts law.

> Consideration for a guaranty agreement usually consists either of the suffering of a detriment by the creditor or of a benefit conferred on the primary debtor. However, a consideration moving directly to the guarantor is not essential, and the consideration need not move only between a creditor and the guarantor; rather, a benefit to the primary debtor, or a detriment to a creditor suffices as consideration to support a contract of guaranty.

38 Am.Jur.2d *Guaranty* § 41 (2002) (internal footnotes omitted); *see New England Merchants Nat'l Bank,* 400 A.2d at 1181 (under Massachusetts law "[e]ven in the absence of any direct benefit, the [guarantor] is bound by its guaranty"). Here, the Fund compromised its claim of $1,818,235 against the Debtor for $1,500,000. Thus, the creditor directly suffered a detriment. Further, the testimony of Messrs. Ricks and Wetmore indicates that AAHC benefitted because the Guaranty facilitated negotiations regarding a sale of the Debtor to Doctors Community Healthcare Corporation in furtherance of AAHC's corporate purposes. I conclude that there is consideration to support the Guaranty.

Since the Debtor's *ultra vires* and lack of consideration defenses fail, I find that the Debtor has also failed to establish, by a preponderance of the evidence, that the Guaranty is invalid. Therefore, the Guaranty is properly deemed an independent obligation of AAHC. The significance of this conclusion is that the HELM Distribution transferred by AAHC to the Fund

and the contemporaneous reduction in the Account Receivable are not preferences.

**B. *Other Preference Elements.***

Although my conclusion regarding the Debtor's interest in the property transferred is dispositive, I will address the other preference elements.

### HELM Distribution

In its answers to the Debtor's first request for admissions, admitted into evidence as an agreed exhibit, the Fund admits that the transfer of the HELM Distribution by AAHC to the Fund was to or for the benefit of a creditor of the Debtor made on or within 90 days before the date of the filing of Debtor's bankruptcy petition. The Debtor contends that the transfer was made on account of an antecedent debt it owed before such transfer was made, while the Debtor was insolvent. The Fund does not challenge these allegations. Assuming, *arguendo,* that the allegations are true, I am left with the fifth preference element which the Fund asserts is not met.

The transfer of the HELM Distribution from AAHC to the Fund allowed the Fund to receive $1,012,168. The question is whether this amount exceeds what the Fund would have received under a hypothetical Chapter 7 liquidation of the Debtor had the HELM Distribution gone to the Debtor rather than the Fund. Craig Jalbert, certified public accountant to the liquidating Trustee in this case, testified credibly at trial that, under the best case scenario, unsecured creditors would receive a 30% dividend. He testified that the allowable claims total approximately $43,000,000 and that the total money available for unsecured creditors is about $14–15,000,000, with approximately $9,600,000 remaining to be disbursed. If one adds to the cash pool the $1,012,168 transfer (and

likewise adds it to the outstanding claims), the dividend would be roughly between 34% and 36%. The Fund, having received $1,012,168 of its $1,500,000 claim, obtained approximately a 67% dividend. I find that, if the transfer of the HELM Distribution from AAHC to the Fund had been a transfer of an interest of the Debtor in property, this element of the preference test would be satisfied.

### Account Receivable

The evidence shows that the Account Receivable was reduced on or within 90 days before the date of the filing of Debtor's bankruptcy petition. The Debtor maintains that it was insolvent at the time and the Fund does not contest this assertion. As noted above, the parties dispute the validity of the Account Receivable. I find the evidence on the question inconclusive. Therefore, I am unable to determine whether the transfer was on account of an antecedent debt made to or for the benefit of a creditor that allowed the creditor to receive more than it would under a hypothetical Chapter 7 liquidation of the Debtor.

*Conclusion:*

I find that the Debtor had no interest in the HELM Distribution. Further, the Guaranty given by the Fund is enforceable and serves as a defense against the preference action relating to the Account Receivable. Accordingly, I find Plaintiff has failed to demonstrate that the Debtor made a preferential payment to the Fund. For this reason, Debtor's complaint, seeking to "avoid and recover a payment made to the [Fund] during December, 1998 in the sum of $1,012,168.00" will be dismissed. A separate order will enter in accordance with this opinion.